UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

ALFREDO J. SARARO, III,

       Petitioner,

v.                             Case No:  2:15-cv-714-FtM-29MRM
                                   Case No. 2:11-cr-80-FTM-29MRM

UNITED STATES OF AMERICA,

       Respondent.

_____

**OPINION AND ORDER**

This matter comes before the Court on Petitioner Alfredo Sararo's (Petitioner or Sararo) Amended Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside or Correct Sentence by a Person in Federal Custody (Cr. Doc. #224; Cv. Doc. #10)[1], filed on January 29, 2016, by retained counsel.  All grounds relate to the alleged ineffective assistance of trial counsel in the plea negotiation process.  The government filed a Response (Cr. Docs. #220; #224; Cv. Doc. #8) to the original § 2255 motion, which is applicable to the Amended Motion.

After review of the Amended Motion and the government's Response, the Court determined an evidentiary hearing was necessary.  (Cv. Doc. #16.)  The Court held an evidentiary hearing

---

[1] The Court will refer to the civil docket as "Cv. Doc.," and will refer to the underlying criminal docket, 2:11-cr-00080-JES-UAM-1, as "Cr. Doc."

on December 11, 2018 (Cv. Docs. #20; 22) and heard testimony from both Petitioner and his former attorney. Thereafter, Petitioner, through current counsel, filed a Memorandum of Supplemental Argument (Cr. Doc. #259), to which the Government responded. (Cv. Doc. #21.)

For the reasons set forth below, Petitioner's § 2255 motion is denied.

## I. Overview

In 2007, Sararo retained attorney Robert Rosenblatt ("Rosenblatt") after learning he was under investigation by the Internal Revenue Service ("IRS") and Federal Bureau of Investigation ("FBI") for tax evasion and real estate fraud. Between July and August of 2007, IRS and FBI agents interviewed Sararo on three separate occasions. (Cv. Docs. #8-1; #8-2; #8-3.) During the August 20, 2007, interview by FBI and IRS agents in the presence of his attorney, Petitioner gave a proffer pursuant to a "Queen For a Day Letter," and was advised that possible charges against him included tax and fraud violations. (Cv. Doc. #8-3.)

Nearly four years later, on March 15, 2011, a federal grand jury in Pittsburgh, Pennsylvania returned a four-count Indictment charging Sararo with filing false tax returns by failing to

disclose his true adjusted gross income for 2004 and 2005, in violation of 26 U.S.C. § 7206(1). (Cr. Doc. #2.)

On April 7, 2011, represented by Rosenblatt, Sararo pled not guilty at his arraignment in Pittsburgh. (Cr. Doc. #1-11.) After the arraignment, Assistant United States Attorney Brendan Conway ("AUSA Conway") and Rosenblatt discussed a government plea offer. (Cv. Doc. #8-5, p. 2.) On May 3, 2011, AUSA Conway drafted a letter setting forth the terms of a proposed plea agreement and sent it to Rosenblatt. (Cv. Doc. #10-1.) Among other terms, the proposed agreement required Sararo to plead guilty to Count One of the Indictment, charging him with filing a false tax return in violation of 26 U.S.C. § 7206(1). (Cv. Docs. #10-1, pp. 2-3; #20-6, pp.2-3 Cr. Doc. #224-1, pp. 2-3.) In exchange, Sararo would be exposed to a maximum of not more than three years imprisonment and three years of supervised release, a $250,000 fine, and a $100 special assessment. (Cv. Docs. #10-1, p. 5; #20-6, p. 5; Cr. Doc. #224-1, p. 5.) The proposed agreement acknowledged that Sararo was also the target of a criminal investigation for fraudulent solicitations of investments in Florida real estate, but the government agreed not to seek criminal charges based on those allegations. (Cv. Docs. #10-1, p. 5; #20-6, p. 5; Cr. Doc. #224-1, p. 5.) Sararo did not accept the government's offer.

On August 18, 2011, a federal grand jury in Pittsburgh returned an eleven-count Superseding Indictment (Cr. Doc. #5)

charging Sararo with seven counts of wire fraud in violation of 18 U.S.C. § 1343 and four counts of filing a false tax return in violation of 26 U.S.C. § 7206(1). On August 23, 2011, Sararo waived his right to appear at his arraignment and pled not guilty to all counts of the Superseding Indictment. (Cr. Doc. #1-32.) Sararo filed a Motion for Change of Venue, and on September 2, 2011, the Western District of Pennsylvania transferred the case to the Fort Myers Division of the Middle District of Florida. (Cr. Doc. #1.)

Sararo proceeded to a jury trial beginning on July 25, 2012, and on August 17, 2012, was convicted of Counts One through Five and Eight through Eleven (Cr. Docs. #59, 92.) The government dismissed Count Six (Cr. Docs. #79; #193, p. 149), and the jury found Sararo not guilty of Count Seven (Cr. Doc. #92, p. 4.)

On January 7, 2013, the undersigned sentenced Sararo to 108 months imprisonment on Counts One through Five, and 36 months imprisonment on Counts Eight through Eleven, all to be served concurrently, followed by concurrent terms of three years supervised release, $500 in special assessments, and restitution in the amount of $2,054,563. (Cr. Doc. #153.) Sararo filed a direct appeal, and on September 23, 2014, the Eleventh Circuit affirmed his convictions. (Cr. Doc. #218.) Sararo petitioned for certiorari, which was denied on February 23, 2015. See Sararo v. United States, 135 S. Ct. 1449 (2015).

## II.  § 2255 Claims and Testimony at Evidentiary Hearing

In his timely § 2255 motion, Petitioner claims that his attorney provided constitutionally ineffective assistance during the plea negotiation process, which resulted in Petitioner's rejection of the government's plea agreement and the imposition of a more severe sentence than he would have received under the plea agreement.  In Ground One, Petitioner argues that his prior attorney rendered ineffective assistance by failing to inform him of the essential terms of a proposed plea agreement and misadvising him as to the Sentencing Guidelines and his chance for success at trial.  (Cr. Doc. #224, pp. 4-11; Cv. Doc. #10, pp. 4-11.)  In Ground Two, Petitioner claims his prior attorney rendered ineffective assistance while operating under a financial conflict of interest by encouraging him to reject the government's plea offer and proceed to trial just so he could collect more attorney's fees.  (Cr. Doc. #224, pp. 11-13; Cv. Doc. #10, pp. 11-13.)[2]

---

[2] As the Court noted in its Opinion and Order dated June 19, 2018, Petitioner's initial § 2255 Motion also argued that counsel rendered ineffective assistance during the plea negotiation process because he misadvised him that the recorded conversation between Sararo, his tax preparer, and accountant would be admissible exculpatory evidence at trial.  (Cv. Doc. #4, p. 35). Petitioner, through counsel, later abandoned this claim in his amended motion, while renewing his other arguments.  Thus, the Court declined to address this abandoned claim.  (Cv. Doc. #16, n. 3.)  See generally Kealy v. United States, 722 F. App'x 938, 941 n.3 (11th Cir. 2018) (declining to address petitioner's claim abandoned in later amended § 2255 motion).

## A. Attorney Rosenblatt's Testimony

At the evidentiary hearing, Rosenblatt provided the following testimony:  Rosenblatt has been an attorney in Florida since 1972 and has represented defendants in criminal cases for the entire time period.  (Doc. #22, p. 7.)  Rosenblatt was retained by Sararo in 2007 because Sararo was being investigated by the IRS and the FBI.  On June 20, 2011, Rosenblatt sat with Petitioner when he made a proffer to the IRS and FBI agents pursuant to a "Queen For a Day" letter.  Although such a proffer was not Rosenblatt's usual practice, Sararo was insistent on his innocence and Rosenblatt hoped that if Sararo told the government the truth, the investigation would end right away.  (Id., pp. 77-78.)  During the proffer, Petitioner denied committing any of the tax violations and any of the fraud offenses for which he was later convicted. (Id., p. 78.)

Although Rosenblatt had sporadic contact thereafter with Petitioner, nothing of real significance happened in the criminal investigation until March 15, 2011. On that date a federal grand jury in Pittsburgh, Pennsylvania returned a four-count Indictment charging Sararo with filing false tax returns by failing to disclose his true adjusted gross income for 2004 and 2005, in violation of 26 U.S.C. § 7206(1).  (Cr. Doc. #2.)

After Petitioner's arraignment on April 7, 2011, in Pittsburgh, AUSA Conway approached Rosenblatt with a verbal plea

offer.  (Id., pp. 16-17.)  Specifically, AUSA Conway offered a plea to one count of the four-count Indictment and, in exchange, the government would recommend Sararo receive a sentence of three years' incarceration.  (Id., p. 17.)  AUSA Conway stated that if Sararo did not accept this offer, the government was going to present additional wire fraud evidence to a grand jury and seek a superseding indictment against Petitioner.  (Id.)

Rosenblatt briefly discussed the government's offer with Sararo in the Pittsburgh courthouse hallway.  (Id., p. 18.)  Later that day Rosenblatt had another conversation about the government's offer with Sararo and his brother at their hotel. Rosenblatt advised Sararo of the proposed terms of the plea offer, including the government's recommendation of three years imprisonment, a $250,000 fine, restitution, the potential Sentencing Guidelines sentence range (which Rosenblatt calculated to be 12-18 months imprisonment), and that if Petitioner rejected the offer, the government would seek to indict him on additional charges.  (Id., pp. 19-23.)  Rosenblatt advised Sararo that if he rejected the offer and lost at trial, he would receive a heavier sentence since he did not accept responsibility and a judge could find he obstructed justice if he testified.  (Id.)  Rosenblatt told Petitioner that he could face substantially more jail time unless he accepted the plea offer.  (Id., p. 29.)  Contrary to the allegations in this case, Rosenblatt testified he never told Sararo

that he would be subject to the same amount of imprisonment if he went to trial, (Id., pp. 26, 29-30), and never told Sararo that if he rejected the agreement, he only faced a sentence of home detention or probation.  (Id., pp. 73, 88.)[3]

From the first day Petitioner was insistent that he was innocent, would not plead guilty to anything, and would not go to jail for even one day.  (Id. pp. 26, 28.)  Petitioner completely denied that he had committed any of the offenses in the Indictment. (Id., pp. 85-86.) Petitioner rejected the government's offer (Id., p. 26), and Rosenblatt so informed AUSA Conway (Id., p. 30.)

Despite Petitioner's rejection of the verbal offer, Rosenblatt received a written proposed plea agreement from AUSA Conway in a letter dated May 3, 2011. (Cv. Doc. #20-6) Rosenblatt thereafter discussed the letter with Sararo, although he could not recall the details of where or when he did so.  (Cv. Doc. #22, pp. 33-35.)  Sararo remained adamant about his innocence and not going to jail.  (Id., pp. 27-28.) Rosenblatt testified that "without any reservation, under oath as an attorney and officer of the court that [Sararo] received that agreement, he went over it, and he made the decision to proceed to trial."  (Id., pp. 34-36, 38-41, 48-54.)  Sararo knew that Rosenblatt was going to communicate his

---

[3] Rosenblatt did ask for house arrest at sentencing, but did so because the government was asking for a large penalty and he hoped the Court would be more lenient.  (Id., p. 74.)

rejection of the offer to AUSA Conway. (Id., p. 58.) Rosenblatt told AUSA Conway by telephone that Sararo rejected the agreement but does not recall the exact date. (Id., pp. 22, 30, 54-55.) In an e-mail dated June 17, 2011, (Cv. Doc. #20-5, pp. 1-2), AUSA Conway stated that, pursuant to a discussion with Rosenblatt, Sararo had rejected the proposed agreement, and therefore the government withdrew the agreement and would seek to indict Petitioner on additional charges. (Cv. Doc. #4-6.)

On August 18, 2011, a federal grand jury in Pittsburgh returned an eleven-count Superseding Indictment (Cr. Doc. #5) charging Sararo with seven counts of wire fraud in violation of 18 U.S.C. § 1343 and four counts of filing a false tax return in violation of 26 U.S.C. § 7206(1).

On December 10, 2011, Rosenblatt sent an e-mail to Sararo in which he told Sararo he believed that, although the Court had denied his motion to dismiss the wire fraud counts, he could obtain a directed verdict when the evidence was developed at trial. (Id., pp. 67-69.) This was based on the facts Petitioner had conveyed to Rosenblatt. Further, Rosenblatt told Sararo the civil cases that had resolved in his favor could be persuasive with the Court. (Id., pp. 69, 75.) At trial, however, the evidence against Petitioner eventually became "overwhelming." (Id., pp. 61, 65-66.)

On June 12, 2012, a month before trial, Rosenblatt sent a letter to AUSA Conway (Cv. Docs. #4-9; 20-1) stating Sararo authorized him to notify the government that he agreed to plead to one misdemeanor tax count and, as a condition of the plea, any taxes he owed would be litigated civilly. (Doc. #22, p. 83.) Sararo would not plead guilty to any of the felony counts. (<u>Id.</u>) Rosenblatt informed Sararo the government would not likely accept that offer but, consistent with his duties, he relayed the offer. (<u>Id.</u>, p. 64.) The government rejected the offer and was emphatic Sararo had to plead guilty to at least one tax fraud and one wire fraud count. (Cv. Docs. #4-8; #22, pp. 60-65.)

During the course of the trial beginning in July 2012, Rosenblatt and AUSA Conway engaged in informal plea discussions. The government insisted on guilty pleas to both a tax count and a wire fraud count, which Sararo rejected. (<u>Id.</u>, pp. 60-61.) Even after the evidence against Sararo became overwhelming, Sararo still insisted on continuing with the trial. (<u>Id.</u>, pp. 61, 65-66.) At no point during Rosenblatt's entire representation did Sararo ever admit he had committed the tax offenses or the wire fraud offenses. (<u>Id.</u>, p. 78.) At no time did Petitioner authorize a plea to a felony tax count. (<u>Id.</u>, p. 81.)

As to the alleged conflict of interest, Rosenblatt testified that he never advised Petitioner to reject the plea agreement so he could get more attorney's fees. (<u>Id.</u>, pp. 87-88.) Rosenblatt

testified that he did not recall the total fee he received for representing Sararo, but his fee was nowhere near the $344,000 alleged by Petitioner. (Id., p. 42.) Rather, after he paid the expert fees to accountant Gail Markham ("Markham"), Rosenblatt estimated he earned approximately $100,000 to $125,000 in attorney's fees. (Id., pp. 42-43.) Additionally, to protect Sararo's work-product privilege, he personally entered into an agreement to pay Markham's fees. (Id., pp. 43-44.) Sararo promised to reimburse the expert fees, and Sararo's friend Richard Bing ("Bing") also promised to pay the money out of a life insurance policy. (Id., p. 44.) After trial, neither Sararo nor Bing paid the fees, and Rosenblatt and Markham settled for $22,500, which Rosenblatt paid out of his own pocket. (Id., pp. 44-45.) Rosenblatt did not charge by the hour, and his fees included representation of Sararo in two civil actions and on direct appeal before the Eleventh Circuit Court of Appeals. (Id., p. 81.)

**B. Petitioner's Testimony**

At the evidentiary hearing Petitioner provided the following testimony: After being contacted by the IRS and the FBI, Petitioner hired Rosenblatt in 2007 upon the referral of another attorney. (Id., p. 101.) Petitioner paid Rosenblatt an initial retainer of $50,000 (in two $25,000 payments), and Rosenblatt accompanied him to the June 2007 "Queen For a Day" proffer meeting with the FBI and IRS agents. (Id., pp. 101-04.) Not much occurred

in the criminal investigation for almost four years, but Petitioner was in periodic contact with Rosenblatt regarding various civil matters.  (Id., p. 103.)  As more time passed, Rosenblatt thought the criminal case was going away.  (Id.)

In March 2011, however, Rosenblatt called Petitioner and informed him that Petitioner had been indicted on tax counts in Pittsburgh.  (Id., pp. 103-04.)  Petitioner pled not guilty at his April 7, 2011 arraignment in Pittsburgh, accompanied by Rosenblatt.  (Id., p. 104-105.)  Petitioner knew Rosenblatt met with AUSA Conway after the arraignment but did not learn the substance of the communications until Rosenblatt discussed the government's plea offer at their hotel later that day.  (Id., pp. 105-106, 108.)

Rosenblatt informed Petitioner that AUSA Conway offered some sort of a plea agreement that would require Sararo to plead guilty to one count of tax fraud in exchange for a recommendation of three years imprisonment.  (Id., p. 106.)  There was some discussion about tax payments required under the agreement, but Rosenblatt never mentioned any fine, supervised release, or other details of the government's offer.  (Id., pp. 106-09.)  Petitioner understood that, under the proposed agreement, his tax liability would be between $80,000 to $200,000, and he would face twelve to eighteen months of imprisonment.  (Id., pp. 106-108.)  Rosenblatt stated that the three-year potential jail sentence applied whether

Petitioner pled or went to trial, and therefore advised Sararo to reject the offer. (Id.) Rosenblatt never told Sararo that the government would seek to indict him on wire fraud charges if he rejected the offer and would not pursue the charges if there was a plea agreement. (Id., pp. 109-10.) Rosenblatt advised that it was best to go to trial, so that is what Sararo was prepared to do. (Id., pp. 110-11.)

In early May 2011, Rosenblatt called Petitioner from California and said that AUSA Conway had called him to discuss a plea offer. (Id., pp. 114-15.) Rosenblatt said the government's offer was exactly the same as before, and that his best choice was still going to trial. (Id., pp. 115-16, 120.) Rosenblatt never told Sararo the details of the plea offer, never told him the government had made a written offer, and never showed or provided him with a copy of AUSA Conway's proposed plea agreement. (Id., pp. 111-17, 119.) Rosenblatt never mentioned the possibility of a superseding indictment, and Sararo did not believe he was the target of a continuing investigation. (Id. pp. 120-22.) Rosenblatt told Petitioner that he would prevail at trial because he had won the civil actions, and he would receive a sentence of house arrest or probation at sentencing. (Id., pp. 165-166.) Petitioner did not see a copy of the proposed written plea agreement until his brother, Christopher Sararo, obtained Petitioner's file to assist him in filing a § 2255 motion. (Id.,

pp. 113-114.) If he had been given the opportunity to review the plea agreement, Sararo testified: there is "no doubt in my mind that I would have taken that plea deal." (Id., pp. 128, 135, 158-59.)

A superseding indictment was filed against Sararo in August 2011. Sararo first heard about it from his brother, who heard about it from the newspaper. They called Rosenblatt, who did not know a superseding indictment had been filed. (Id., p. 122.)

Sararo was not aware of any other plea negotiations between Rosenblatt and the government thereafter. (Id., pp. 119-120, 125.) Rosenblatt was always upbeat about trial, citing to recent favorable civil rulings in Sararo's favor, the possibility of a directed verdict, appeal issues, and a probationary or house arrest sentence. (Id., pp. 123-24, 127, 165.) Petitioner did not discuss with or authorize Rosenblatt to make an offer to the government that Sararo would plead guilty to a misdemeanor offense. (Id., pp. 119-120.) At no time did Sararo ever tell Rosenblatt he was guilty of any of the offenses charged in the original or superseding indictments. (Id., pp. 143-44, 156-67.)

Sararo asserted he paid Rosenblatt approximately $350,000 for his representation in this case. (Id., p. 125.) Sararo provided a chart of purported payments made to Rosenblatt totaling $344,602.47. (Cv. Doc. #10-2.)

## III. Analysis

### A. Ineffective Assistance of Counsel Legal Principles

"Defendants have a Sixth Amendment right to counsel, a right that extends to the plea-bargaining process." Lafler v. Cooper, 566 U.S. 156, 162 (2012). To prevail on a claim of ineffective assistance of counsel, a habeas petitioner must usually demonstrate both that (1) counsel's performance was deficient because it fell below an objective standard of reasonableness, and (2) prejudice resulted because there is a reasonable probability that, but for the deficient performance, the result of the proceeding would have been different. See Hinton v. Alabama, 571 U.S. 263, 272 (2014) (citing Strickland v. Washington, 466 U.S. 668, 687, 694 (1984) and Padilla v. Kentucky, 559 U.S. 356, 366 (2010)).

To establish prejudice where the ineffective advice led to the rejection of a government offer,

> a defendant must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.

Lafler, 566 U.S. at 163–64.

This case has an added twist because Petitioner is asserting that his attorney functioned under an actual conflict of interest due to a desire to prolong the proceedings and thus obtain greater attorney's fees. As the Eleventh Circuit recently summarized:

> Under the Sixth Amendment, a defendant in a criminal case has the right to the effective assistance of trial counsel. See Strickland v. Washington, 466 U.S. 668, 687-88, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); Freund v. Butterworth, 165 F.3d 839, 858 (11th Cir. 1999) (en banc). This right includes having counsel whose work is not affected by a conflict of interest. See Cuyler v. Sullivan, 446 U.S. 335, 350, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980). A defendant claiming that his counsel rendered ineffective assistance due to a conflict of interest must, except in rare cases, establish an "actual conflict," i.e., a "conflict [that] adversely affected his counsel's performance." Mickens v. Taylor, 535 U.S. 162, 174, 122 S. Ct. 1237, 152 L. Ed. 2d 291 (2002). See also id. at 171, 122 S. Ct. 1237 (an "actual conflict" is "a conflict that affected counsel's performance—as opposed to a mere theoretical division of loyalties") (emphasis omitted).
>
> . . .
>
> In contrast to most ineffective-assistance-of-counsel cases, the foregoing rule governing conflicts of interest is "prophylaxis," Mickens, 535 U.S. at 176, 122 S. Ct. 1237, so that the defendant must establish "adverse effect," but "need not demonstrate prejudice in order to obtain relief." Cuyler, 446 U.S. at 349-50, 100 S. Ct. 1708. Where there is a "breach[ of] the duty of loyalty, perhaps the most basic of counsel's duties," and "it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests, ... it is reasonable for the criminal justice system to maintain a

> fairly rigid rule of presumed prejudice for
> conflicts of interest"—although "the rule
> [still] is not quite the per se rule of
> prejudice that exists for [certain other]
> Sixth Amendment claims." Strickland, 466 U.S.
> at 692, 104 S. Ct. 2052. The question is
> whether "the verdict [is] unreliable,
> [irrespective of whether] Strickland
> prejudice c[ould] be shown." Mickens, 535 U.S.
> at 173, 122 S. Ct. 1237.

United States v. Williams, 902 F.3d 1328, 1332–33 (11th Cir. 2018)

(footnotes omitted).

## B. Credibility Determination Principles

Because Petitioner's and Rosenblatt's testimony directly conflict in important aspects, the Court must assess and determine the credibility of the witnesses. A court considers various factors in assessing the credibility of witnesses, including a witness's demeanor, the consistencies or inconsistencies within the witness's testimony, and any interest the witness may have in the outcome of the hearing. United States v. Ramirez-Chilel, 289 F.3d 744, 749-50 (11th Cir. 2002); see also Anderson v. City of Bessemer City, 470 U.S. 564, 575 (1985). As the fact finder regarding the § 2255 motion, the Court essentially follows the principles set forth in the Pattern Eleventh Circuit Jury Instruction as to the evaluation of the credibility of witnesses. 11th Cir. Pattern Jury Instr. – Crim. B5 (2019).

**C. Ground Two:  Alleged Financial Conflict of Interest**

The Court begins with Ground Two because its resolution impacts the legal standard to be applied.  Petitioner asserts that Rosenblatt had a financial conflict of interest which caused him to improperly encourage Petitioner to reject the government's plea offer so that he could earn more attorney's fees by prolonging the case.

The Court follows a two-step process.  The Court first determines whether Petitioner's attorney was operating under an actual conflict of interest, and then analyzes whether that conflict adversely effected counsel's performance.  <u>Ferrell v. Hall</u>, 640 F.3d 1199, 1244 (11th Cir. 2011); <u>Reynolds v. Chapman</u>, 253 F.3d 1337, 1342 (11th Cir. 2001).  Under the first step, "the possibility of conflict is insufficient to impugn a criminal conviction."  <u>Cuyler</u>, 446 U.S. at 350.  A petitioner must show more than the "possibility" of a conflict, but "must establish that an actual financial conflict existed by showing that his counsel actively represented his own financial interest."  <u>Caderno v. United States</u>, 256 F.3d 1213, 1218 (11th Cir. 2001).  <u>See also</u> <u>Reynolds</u>, 253 F.3d at 1342 (citing <u>Smith v. White</u>, 815 F.2d 1401, 1404 (11th Cir. 1987)).

Under the second step, a petitioner must demonstrate the conflict adversely affected his attorney's performance by showing (1) his attorney could have pursued a plausible alternative

strategy, (2) such alternative strategy was reasonable, and (3) the attorney failed to follow the strategy because it conflicted with his own interests. <u>Reynolds</u>, 253 F.3d at 1343. However, "courts generally presume that counsel will subordinate his or her pecuniary interests and honor his or her professional responsibility to a client." <u>Caderno</u>, 256 F.3d at 1219 (citations omitted) (concluding that letters indicating counsel's frustration at defendant's failure to pay his attorney's fees were insufficient to establish an actual, rather than merely a potential, financial conflict of interest). The Court concludes that Petitioner has not established either step.

Initially, Sararo inflates the amount of attorney fees paid to Rosenblatt which could have been the source of a financial conflict of interest. Sararo submitted a chart of fees "Paid to Attorney Bob Rosenblatt" (Doc. #10-2) which totals $344,602.47. The very first entry, for $10,500, was identified as a referral fee paid to another attorney, not to Rosenblatt. The chart then identifies a $50,000 initial retainer to Rosenblatt, followed by three payments of $1,000 and one payment of $5,000 with no explanation of their purpose or recipient. By the time Sararo was indicted in March 15, 2011, it appears Rosenblatt had received only the $50,000 retainer, and perhaps $8,000 in other unspecified funds. Of course, this $58,000 cannot have been the conflict of

interest Petitioner asserts because the government had not yet broached the possibility of negotiated plea.

The chart indicates that, after the original indictment, Rosenblatt was paid an additional retainer totaling $25,000 in three payments in March 2011 and an additional payment of $15,000 in May 2011. Thus, Petitioner asserts that Rosenblatt received $40,000 in fees during the period of plea negotiations with the government.

The chart reflects that after the plea discussions were over, between October 2011 and May 2012, Rosenblatt received additional retainer payments totaling $60,000. (Cv. Doc. #10-2.) Reading the chart liberally, Rosenblatt received two additional payments of $20,000 each during trial. (Id., p. 3.) The remaining amounts in the chart appear to be expenses and costs of such things as defense witnesses, followed by post-trial payments, transcript costs, fees, and the like.

Given the nature of the offenses and the supporting evidence, it is clear that the amount of attorney fees was reasonable. Even reasonable attorney's fees, however, may be an actual conflict. The Court finds, however, that this was not the case here. There has been no credible showing that the attorney fee arrangement created an actual conflict of interest or that Rosenblatt made decisions regarding plea negotiations to benefit his financial interests while harming his client. Rosenblatt testified that

none of his plea negotiation decisions were influenced by the desire to increase attorney's fees, and the Court found this testimony credible.  As discussed in more detail in the discussion of Ground One below, the Court finds that none of the actions taken by Rosenblatt were the result of a desire to obtain more attorney's fees at the expense of the best interest of his client.  While Sararo claims otherwise, the Court credits the testimony of Rosenblatt where it conflicts with that of Sararo, as discussed below.

**D. Ground One:  Ineffective Assistance of Counsel During Plea Negotiations**

Petitioner argues that Rosenblatt rendered ineffective assistance during the plea negotiation process by (1) failing to communicate the essential terms of the government's offer, (2) misadvising him as to amount of incarceration he faced if he rejected the plea, and (3) misadvising him that he would prevail at trial because he was successful in the civil actions against him relating to the real estate fraud.  The Court finds that the credible evidence in this case establishes that these allegations are not true, and that Sararo received effective assistance of counsel in the plea negotiation process.

The Court accepts the testimony of Rosenblatt in all material factual aspects where it conflicts with Sararo's testimony.  In

reaching this credibility determination, the Court has considered the following factors:

- Sararo obviously has an interest in the outcome of the § 2255 motion and its impact on vacating his convictions and/or significantly reducing his sentence. Rosenblatt has no interest in the outcome of the case.

- The Court had the opportunity to see and hear both Sararo and Rosenblatt testify and observe their demeanor during the evidentiary hearing. While Rosenblatt was forthcoming, Sararo often gave grudging answers, or would not answer questions directly or at all.

- Sararo has a history of not telling the truth when he believes a lie would be in his best interest.
  - Sararo was convicted of multiple offenses involving fraud and dishonesty after a jury trial. On cross examination at the § 2255 evidentiary hearing, Sararo admitted for the first time that he was guilty of the tax offenses and had lied for money. (Doc. #22, pp. 131-32.)
  - Sararo admitted lying to agents of the FBI and IRS during his "Queen For a Day" proffer. (Id., pp. 140-42.)
  - Sararo admitted that he lied to a number of people during the real estate activities which formed the

basis of his convictions. Sararo agreed with the statement "that from 2004 through 2012, the trial date, you were habitually in the habit of making intentional false statements, and as a result, you received money or financial benefits." (<u>Id.</u>, p. 155.)

As to the disputed material facts, the Court finds:

- Petitioner received the close attention of counsel during the pre-trial phase of the case with regard to plea negotiations with the government;

- Rosenblatt communicated the essential terms of the government's verbal offer to Sararo on April 7, 2011;

- Rosenblatt fully and accurately discussed and explained all material terms of the May 3, 2011 plea offer from the government;

- Rosenblatt informed Petitioner that if he did not accept the plea offer, the government would seek to indict him on new wire fraud charges which would increase his potential penalties;

- Rosenblatt did not advise Petitioner that Petitioner would receive a sentence of home confinement or probation, or receive the same sentence whether there was a plea or a trial;

- Rosenblatt in good faith discussed Sararo's chances for success at trial based on factual information given by Sararo and favorable civil case judgments obtained in December of 2011. Sararo always told Rosenblatt he was not guilty of any offense, and since Sararo had already rejected the government's offer, these conversations had no impact on Petitioner's decision to reject the three-year plea offer.

Additionally, the Court finds that Sararo would not have accepted the government's offer at any time regardless of what Rosenblatt told him. Both Rosenblatt and Sararo agree that Sararo always insisted on his innocence and stated that he would not plead guilty and would not agree to do even a day in jail. Sararo admitted that he never told Rosenblatt that he lied on his tax returns (Cv. Doc. #22, pp. 143-44) and never told Rosenblatt that he lied to persons involved in the wire fraud charges. (Id., pp. 156-57.) Sararo did not even authorize the misdemeanor plea which Rosenblatt suggested to the government in a June 12, 2012 letter. (Cv. Doc. #4-9.) The first time Petitioner admitted his guilt was on cross examination at the § 2255 evidentiary hearing. Petitioner's evidentiary hearing testimony that he admitted his guilt at sentencing is not borne out by the record. (Cr. Doc. #198, pp. 28-33.) The Court finds that Sararo's testimony that he would have accepted a plea to a tax count carrying a three-year

maximum term of imprisonment is not credible. Ground One of the motion is denied.

Accordingly, it is now

**ORDERED:**

1. Petitioner's Amended Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside or Correct Sentence by a Person in Federal Custody (Cr. Doc. #224; Cv. Doc. #10), previously taken under advisement pending a hearing, is **DENIED**.

2. The Clerk of the Court shall enter judgment accordingly, terminate any pending motions, and close the civil file. The Clerk is further directed to place a copy of the civil Judgment in the criminal file.

**A CERTIFICATE OF APPEALABILITY (COA) AND LEAVE TO APPEAL *IN FORMA PAUPERIS* ARE DENIED.** A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1); Harbison v. Bell, 556 U.S. 180, 183 (2009). "A [COA] may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(B)(2). To make such a showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004), or that "the issues presented were adequate to deserve

encouragement to proceed further," <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 336 (2003) (citations omitted).  Petitioner has not made the requisite showing in these circumstances.  Finally, because Petitioner is not entitled to a certificate of appealability, he is not entitled to appeal *in forma pauperis*.

   **DONE** and **ORDERED** in Fort Myers, Florida this   3rd   day of April, 2019.

_____
JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE

Copies:
All Parties of Record